No. 13-1608

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

**National Heritage Foundation, Inc.**, Appellant

v.

**John R. Behrmann**, **Nancy Behrmann, The Highbourne Foundation, Dolores
F. Anderson, and The Dodie Anderson Foundation**, Appellees
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA, AT ALEXANDRIA
No. 1:12-cv-01329-AJT-JFA
_____

**BRIEF OF APPELLANT
NATIONAL HERITAGE FOUNDATION, INC.**
_____

Erika L. Morabito
Rory E. Adams
FOLEY & LARDNER LLP
3000 K Street N.W.
Suite 600
Washington, DC 20007-5109
Telephone: 202-672-5300
emorabito@foley.com
radams@foley.com

David B. Goroff
FOLEY & LARDNER LLP
321 N. Clark Street
Suite 2800
Chicago, IL 60654
Telephone: 312-832-4500
dgoroff@foley.com

*Counsel for Appellant National Heritage Foundation, Inc.*

ORAL ARGUMENT REQUESTED

4826-6201-1924

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __13-1608__        Caption: __National Heritage Foundation, Inc. v. Behrmann__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__National Heritage Foundation, Inc.__
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
         (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                          ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                    ☐ YES ☑ NO
      If yes, identify all such owners:

- 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?  ☑YES ☐NO
If yes, identify any trustee and the members of any creditors' committee:

There is no trustee, as Appellant is a reorganized debtor following a Chapter 11 bankruptcy
proceeding.  Similarly, there is currently no creditors' committee, as the creditors' committee
has been disbanded.

Signature:  /s Erika L. Morabito                            Date:    May 24, 2013

Counsel for:  National Heritage Foundation, Inc.

# CERTIFICATE OF SERVICE
**************************

I certify that on    May 24, 2013    the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Gregory M. Wade, Esq.
Wade, Friedman, Sutter & Dupray, P.C.
616 N. Washington Street
Alexandria, VA 22314

Glenn W. Merrick, Esq.
G.W. Merrick & Associates, LLC
Legacy Cascades
6300 South Syracuse Way, Suite 220
Centennial, CO 80111

s/ Erika L. Morabito                                  May 24, 2013
(signature)                                          (date)

# TABLE OF CONTENTS

Page No.

CORPORATE DISCLOSURE STATEMENT ....................................................

TABLE OF AUTHORITIES ................................................ iv

I.  INTRODUCTION ............................................................1

II.  STATEMENT OF JURISDICTION ..................................5

III.  STATEMENT OF ISSUE PRESENTED FOR REVIEW ...........................6

IV.  Statement of case ............................................................6

    A.  Of NHF's 9,000 Donors, Only Two Now Challenge The Releases ........................................................6

    B.  After Hearing Evidence, Judge Mitchell Upholds The Releases As Essential To NHF's Reorganization. ...................7

    C.  The District Court Originally Affirms That The Releases Are Enforceable.......................................................8

    D.  This Court In *NHF I* Remands For Specific Fact-Finding..................8

    E.  A New Bankruptcy Judge Finds The Releases Are Not Appropriate And A New District Judge Affirms. ...............8

    F.  The District Court Enters A Stay Pending Appeal. ...........9

    G.  The Bankruptcy Court Holds The Behrmanns In Contempt For Filing Their California Action.................................9

V.  STATEMENT OF FACTS ........................................... 10

    A.  Prior To Bankruptcy, NHF Was A Public Charity With A Mission To Help Administer Charitable Donations And Projects. .......................................................... 10

    B.  A Lawsuit That Later Proves To Have Been Corrupt Forces NHF To Seek Bankruptcy Protection. ...................... 12

    C.  NHF Takes Steps To Reorganize Through Bankruptcy. .................. 14

        1.  All Of NHF's Donors Had Proper Notice And An Opportunity To Pursue Claims. ............................... 14

        2.  The Behrmanns Settle Their Claim, While Anderson Forfeits Hers........................................... 15

        3.  The Only Impaired Classes Support The Plan......................... 16

D.   NHF's Duty To Indemnify And Advance Defense Costs For Claims Against Directors And Officers Makes The Releases Essential........................................................................... 18

E.   Judge Mitchell Hears Evidence Demonstrating That The Releases Are Essential....................................................... 19

F.   The Bankruptcy Court, Per Judge Mitchell, Confirms The Plan, Including The Releases. ..................................................... 23

G.   While This Court Remands For Specific Fact-Finding Supporting The Releases "If The Record Permits," A New Bankruptcy Judge On Remand Rejects The Releases Despite Unequivocal Record Support. ........................................... 25

     1.   This Court Remands For Specific Fact-Finding. ..................... 25

     2.   Judge Kenney Rejects Judge Mitchell's Legal Conclusions And Rules That The Releases Are Unenforceable. ........................................................ 26

     3.   Judge Kenney Stays His Ruling............................................. 27

H.   On Appeal, A New District Judge Reaches The Opposite Result From The Prior District Judge............................................... 28

I.   Both Lower Courts Now Acknowledge The Danger That Suits Like The Behrmanns' California Action Pose To NHF. .................. 29

     1.   The Bankruptcy Court Holds The Behrmanns In Civil Contempt For Filing The California Action. ........................... 29

     2.   The District Court Stays Its Order Pending Appeal ............... 30

VI.   SUMMARY OF ARGUMENT ..................................................... 30

VII.   ARGUMENT.............................................................................. 36

A.   The District Court Applied An Improper Standard Of Review Of The Remand Order........................................................... 36

B.   A Change In Judge Should Not Lead To A Different Result On The Same Record; Yet That Is What Happened Here. ..................... 38

C.   This Circuit Has Long Approved Of Releases In Favor Of Non-Debtors In Appropriate Circumstances, And The Record Shows Such Circumstances Exist Here. ........................................... 44

     1.   The "Identity Of Interest" Between NHF And Its Directors And Officers – Supports The Releases. ................... 46

2.    The Directors And Officers Made A Substantial Contribution Through Their Continued Service. ..................... 48

3.    The Undisputed Record Evidence Shows That The Releases Are Essential To NHF's Reorganization. ................. 50

(a)    The Record Shows The Certainty Of Costly Donor Suits. ............................................................... 51

(b)    The Record Shows That NHF's Directors And Officers Would Not Serve Absent The Releases. ......... 53

4.    The Impacted Classes Overwhelmingly Voted In Favor Of The Plan. ........................................................ 56

5.    The Plan Made Provision To Pay All Classes Affected By The Releases. ..................................................... 58

6.    The Plan Provided An Opportunity For Claimants Who Chose Not To Settle To Recover In Full. ................ 59

VIII.  CONCLUSION ........................................................... 59

REQUEST FOR ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

JOINT APPENDIX

# TABLE OF AUTHORITIES

**Page No.**

## CASES

*A.H. Robins Co. v. Piccinin*,
  788 F.2d 994 (4th Cir. 1986) ...................................................................46

*Anderson v. NHF*,
  439 F. App'x. 238 (4th Cir. 2011),
  *cert. denied*, 132 S. Ct. 850 (2011)......................................................16

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'Ship*,
  526 U.S. 434 (1999)...........................................................................52, 56

*Bankcard Am., Inc. v. Universal Bancard Sys.*,
  203 F.3d 477 (7th Cir. 2000) ...............................................................37

*Beanstalk Group v. AM Gen. Corp.*,
  283 F.3d 856 (7th Cir. 2002) ...............................................................55

*Behrmann v. NHF*,
  663 F.3d 704 (4th Cir. 2011) .................................................. *passim*

*Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648 (6th Cir. 2002)........................................... *passim*

*Colonial Penn Ins. Co. v. Coil*,
  887 F.2d 1236 (4th Cir. 1989) ...............................................................10

*Columbus-AM Discovery Group v. Atl. Mut. Ins. Co.*,
  56 F.3d 556 (4th Cir. 1995) ...............................................................39

*Consolidated Gas Supply Corp. v. Federal Energy Regulatory Com.*, 653
  F.2d 129 (4th Cir. 1981) ............................................................... 13-14

*Henry A. Knott Co. v. Chesapeake & Potomac Tel. Co.*,
  772 F.2d 78 (4th Cir. 1985) ................................................. 33, 36-37

*In re Dow Corning Corp.*,
  287 B.R. 396 (E.D.Mich. 2002).........................................................53

*In re Exide Technologies*,
  303 B.R. 48 (Bankr. D. Del. 2003)............................................. 49-50

*In re Harford Sands, Inc*,
  372 F.3d 637 (4th Cir. 2004) ...............................................................37

*In re Lower Bucks Hosp.*,
   No. 10-10239-ELF, 2012 WL 165596
   (Bankr. E.D.Pa. May 10, 2012) .................................................................. 56-57

*In re Mercedes Homes, Inc.*,
   431 B.R. 869 (Bankr. S.D. Fla. 2009) .................................................... 48-49, 53

*In re Phinney*,
   405 B.R. 170 (E.D.Va. 2009) .......................................................................37

*In re Railworks Corp.*,
   345 B.R. 529 (Bankr. D. Md. 2006) ...............................................................45

*In re SL Liquidation, Inc.*,
   428 B.R. 799 (Bankr. S.D. Ohio 2010) .....................................................49, 53

*In re Tribune Co.*,
   464 B.R. 126 (Bankr. D. Del. 2011) ...............................................................56

*Menard-Sanford v. Mabey (In re A.H. Robins Co.)*,
   880 F.2d 694 (4th Cir. 1989) ................................................................... *passim*

*Norwest Bank Worthington v. Ahlers*,
   485 U.S. 197 (1988)........................................................................................49

*Stuart v. First Mount Vernon Indus. Loan Ass'n*,
   3 F. App'x 38 (4th Cir. 2001) .................................................................3, 44

*United States v. Jimenez*,
   593 F.2d 391 (5th Cir. 2010).  .....................................................................54

*United States v. M.C.C. of Florida, Inc.*,
   967 F.2d 1559 (11th Cir. 1992) .......................................................................39

*United States v. Simpson*,
   996 U.S. App. LEXIS 13570 (4th Cir. June 7, 1996) .......................................10

## FEDERAL STATUTES

11.U.S.C. §101(5) .........................................................................................35, 57

11.U.S.C. §101(10) ......................................................................................35, 57

11 U.S.C. §524(e)  .............................................................................................44

11 U.S.C. §1126(f).......................................................................................17, 56

11 U.S.C. §1129(a)(11)  .............................................................................52, 55-56

26 U.S.C. §4966(d)(2).......................................................................................10

28 U.S.C. §158(a) ......................................................................................5

28 U.S.C. §1291 .........................................................................................5

**STATE STATUTES**

GA Code §14-3-856(a)(2) .........................................................................18

GA Code §14-3-858(a) .............................................................................18

## I.  <u>INTRODUCTION</u>

This appeal concerns the validity of releases and injunctions ("Releases") in favor of the directors ("Directors") and officers ("Officers") of reorganized debtor National Heritage Foundation ("NHF") that were set forth in its Chapter 11 plan of reorganization.  This matter comes before this Court for the second time, now with NHF as the Appellant, following the Court's remand in an earlier appeal – *Behrmann v. NHF*, 663 F.3d 704 (4th Cir. 2011) ("*NHF I*") (attached at JA1528-36).[1]

NHF's bankruptcy was presided over by Hon. Stephen S. Mitchell of the Bankruptcy Court for the Eastern District of Virginia ("Bankruptcy Court").  On October 15-16, 2009, Judge Mitchell conducted a two-day evidentiary hearing ("Confirmation Hearing") on the confirmation of NHF's Fourth Amended and Restated Plan of Reorganization ('Plan").  In that hearing, NHF presented evidence, including the lengthy testimony of its Vice-President Janet Ridgely, showing the necessity of the Releases.  After this, the Bankruptcy Court held in its order confirming the Plan ("Confirmation Order") that the Releases were appropriate under the special circumstances of this case, especially because NHF's

---

[1] "JA" refers to the parties' Joint Appendix, which NHF is filing simultaneously.  For completeness, NHF includes therein all items from the Joint Appendix submitted in *NHF I*.

bylaws give it a duty to advance defense costs and indemnify its Directors and Officers any time they are sued. This means that the costs of such suits are actually borne by NHF.

Those who are appellees here – John Behrmann, Nancy Behrmann, and their foundation, The Highbourne Foundation (collectively, "Behrmanns"), Dolores Anderson, and her foundation, The Dodie Anderson Foundation ("Anderson") then appealed the Confirmation Order.[2] After the District Court for the Eastern District of Virginia ("District Court"), per Hon. Claude Hilton, affirmed, the Behrmanns and Anderson appealed to this Court.

In *NHF I*, this Court vacated the Confirmation Order insofar as it approved the Releases and remanded because it determined the Bankruptcy Court had failed to make specific findings of fact necessary to support its conclusions of law. This Court held that it could not exercise meaningful appellate review to properly assess whether NHF's circumstances "entitle it to the benefit of the Release Provisions" and remanded the case "to allow the bankruptcy court – if the record permits it – to set forth specific factual findings supporting its conclusions." (JA1535)

---

[2] While there appear to be five appellees here, in reality, they represent only two donors to NHF. The Behrmanns are husband and wife and gave to NHF jointly through their donor advised fund ("DAF") (as hereinafter described) – the Highbourne Foundation, which has no separate legal existence. Anderson gave to NHF through her DAF, the Dodie Anderson Foundation, which likewise has no separate legal existence.

Importantly, in remanding, the Court reaffirmed that its long-standing precedent – including *Menard-Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694 (4th Cir. 1989) ("*A.H. Robins*"), and *Stuart v. First Mount Vernon Indus. Loan Ass'n*, 3 F. App'x 38 (4th Cir. 2001) ("*Stuart*") – allows a bankruptcy court in appropriate circumstances to release liability of non-debtors under the terms of a Chapter 11 plan.

Here, the record amply supports the Releases' validity, including uncontroverted witness testimony.  Therefore, it seems clear that had Judge Mitchell presided on remand, he would have corrected the procedural defect noted by this Court and entered specific factual findings supporting his legal conclusions upholding the Releases.  However, Judge Mitchell had retired and the case was assigned to a new bankruptcy judge, Hon. Brian M. Kenney.  In his Order on Remand dated August 27, 2012 ("Remand Order" or "RO", JA1541-69), Judge Kenney rejected Judge Mitchell's legal conclusions and held that the Releases were unenforceable.  When NHF appealed to the District Court, a new District Court Judge – Hon. Anthony J. Trenga – agreed, reaching the opposite conclusion from Judge Hilton.

There are three reasons why this Court should reverse:

First, even though Judge Kenney heard no witness but instead reviewed the record after it had been fully assembled, the District Court reviewed his "factual

findings" under the deferential clearly erroneous standard of review, rather than the required *de novo* review standard.

Second, as this Court noted in *A.H. Robins*, it undermines respect for the law when two judges reach inconsistent results based on the same record, facts and law, but that is what happened here. The switch in position by the Courts below was especially unjustifiable, as the record "permitted" findings supporting Judge Mitchell's conclusions.

Finally, both lower Courts purported to consider each of the six substantive factors for evaluating non-debtor releases set forth in *Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648 (6th Cir. 2002) ("*Dow Corning*"), but misapplied these factors to the facts. The first *Dow Corning* factor is whether there is identity of interests between the debtor and released parties. Judge Kenney correctly found an identity between NHF and its Directors and Officers arising from NHF's duty to advance fees and indemnify its Directors and Officers, but otherwise erred in finding that the remaining factors had not been satisfied. Judge Trenga erroneously concluded that even the identity-of-interest factor had not been satisfied. Both Courts disregarded record evidence showing the costs and threats of donor suits and NHF's inability to bear such costs.

Indeed, since the Remand Order was issued, it became known to both Judge Kenney and Judge Trenga that the Behrmanns in fact had already sued NHF, a

discharged debtor, and its Directors and Officers in the District Court for the Central District of California, *Behrmann v. Goldstein*, CV12-5636-DMG (CWx) ("California Action") in June 2012, nearly two months prior to the issuance of the Remand Order and without Judge Kenney's knowledge.  The California Action sought treble damages for RICO, punitive damages and other draconian relief.

As both Courts below have examined the Behrmanns' overreach in the California Action, they have recognized the harm that such suits pose to NHF. Judge Kenney held that Behrmanns and their counsel were in civil contempt for filing that suit in defiance of the Plan's requirements.  Judge Trenga, too, has now recognized the irreparable injury that NHF faces from this and other suits and entered a stay pending appeal.

Therefore, NHF respectfully requests that this Court reverse the order of the District Court ("Order") and declare that the facts as found by the Bankruptcy Court demonstrate that the Releases are enforceable.

## II.    <u>STATEMENT OF JURISDICTION</u>

The District Court had jurisdiction over NHF's appeal pursuant to 28 U.S.C. §158(a).  On April 3, 2013, the District Court issued its Order affirming the Remand Order.  (JA1818-37)  That Order was a final order disposing of all claims between the parties.  NHF timely filed its Notice of Appeal to this Court on May 2, 2013.  (JA1840-65)  This Court has jurisdiction pursuant to 28 U.S.C. §1291.

## III.    STATEMENT OF ISSUE PRESENTED FOR REVIEW

Whether, after a remand by this Court which allowed the Bankruptcy Court to set forth specific factual findings supporting its conclusion that the Releases were enforceable "if the record permits it," the Bankruptcy Court and District Court erred by finding that the Releases were not enforceable – the exact opposite conclusion of how these Courts had ruled previously – when the record not only "permit[ted]" the finding that the Releases were enforceable, but showed the urgent importance of these provisions.

## IV.    STATEMENT OF CASE

### A.    Of NHF's 9,000 Donors, Only Two Now Challenge The Releases

NHF is a non-profit corporation organized under Georgia law to carry out charitable purposes.  (JA490)  In part as a result of a $6 million judgment entered against it by a Texas state trial court ("Texas State Court") – NHF filed a voluntary bankruptcy petition under Chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court on January 24, 2009 (Bankr. Dkt. 1;[3] RO ¶15, JA1543).  The Bankruptcy was assigned to Judge Mitchell.  In that Bankruptcy, NHF submitted

---

[3] Dkt. __" refers to entries in the District Court's docket of this case, No. 1:12-cv-01329-AJT-JFT.  "Bankr. Dkt. __." refers to entries in the Bankruptcy Court's docket of this case, No. 09-10525-BKF.  All bankruptcy docket entries are part of docket entry 1 on the District Court's docket and included in the record in this appeal.

its Plan which contained a Release Provision, which released certain non-debtors, including NHF's Directors and Officers, from liability for pre-confirmation activities related to, among other things, NHF's business and the bankruptcy proceeding. (*See* Plan §7.19, as modified by the Confirmation Order, JA638, 1068). The Plan also enjoined the prosecution of any action in violation of the Release Provision ("Injunction Provision"). (Plan §7.20, JA639, 1068) It contained an Exculpation Provision, which, among other things, held that NHF's Directors and Officers "shall have no liability" for actions taken in connection with, among other things, the bankruptcy proceeding and the Plan, unless the party bringing the suit first obtained the prior approval of the Bankruptcy Court to bring such action. (Plan §7.21, JA639, 1068) Out of approximately 9,000 donors, three objected to the Plan's Releases. NHF resolved the objection of one such donor, who is not a party to this appeal. The Behrmanns and Anderson are the only two donors who continue to object.

### B. After Hearing Evidence, Judge Mitchell Upholds The Releases As Essential To NHF's Reorganization.

Judge Mitchell presided over an extensive, two-day evidentiary hearing at which he heard witnesses, received documents and took argument. He then issued the Confirmation Order confirming the Plan, including the Releases (as they had been modified during the course of the Hearing). (JA1033-71) He found that the Releases were necessary to the Plan's success, given NHF's unique circumstances.

4826-6201-1924

7

### C.   The District Court Originally Affirms That The Releases Are Enforceable.

On October 23, 2009, the Behrmanns and Anderson appealed the Confirmation Order to the District Court.  (JA1217-20)  On August 17, 2010, the District Court, per Hon. Claude M. Hilton, affirmed the Confirmation Order, holding that it "[was] not clearly erroneous nor contrary to law."  (JA1366)

### D.   This Court In *NHF I* Remands For Specific Fact-Finding.

On August 31, 2010, the Behrmanns and Anderson appealed the District Court's affirmance to this Court, beginning the *NHF I* appeal.  (JA1367-68)  On December 9, 2011, in *NHF I*, this Court vacated the Confirmation Order and remanded for the limited purpose of "allowing the bankruptcy court – if the record permits it – to set forth specific factual findings supporting its conclusions" that the Releases and Exculpation Provision are enforceable.  (JA1535)[4]

### E.   A New Bankruptcy Judge Finds The Releases Are Not Appropriate And A New District Judge Affirms.

On remand, the case was assigned to a new judge, Judge Kenney, as Judge Mitchell had retired.  On August 27, 2012, Judge Kenney issued the Remand Order.  (JA1541-69)  The Remand Order did not set forth specific factual findings supporting the Bankruptcy Court's conclusion that the Releases were appropriate.

---

[4] On remand, both lower Courts agreed that the Exculpation Provision is enforceable and that conclusion is not at issue in this appeal.

Instead, it held the opposite – that the Releases were unenforceable.  On September 9, 2012, NHF, now as appellant, appealed the Remand Order to the District Court. (Bankr. Dkt. 1021)

On October 25, 2012, the Bankruptcy Court entered a stay of the Remand Order pending appeal to the District Court, finding, *inter alia*, that NHF had presented a substantial, non-frivolous argument on appeal and faced irreparable injury absent a stay.  (JA1573-80)

On April 3, 2013, the District Court (now per Judge Trenga) affirmed the Remand Order.  (JA1818-39)  This appeal followed.

### F.    The District Court Enters A Stay Pending Appeal.

On June 21, 2013, the District Court entered a stay of its Order pending this appeal.  (Fourth Cir. Dkt. 20)  It found that NHF faced irreparable injury absent a stay and had established the requisite likelihood of success on the merits of its appeal.  In so finding, the District Court emphasized that the California Action showed the risk of harm to NHF from donor suits against its Directors and Officers.

### G.    The Bankruptcy Court Holds The Behrmanns In Contempt For Filing Their California Action.

Also on June 21, 2013, after a two-day evidentiary hearing, the Bankruptcy Court issued its 41-page order holding the Behrmanns in civil contempt ("Contempt Order") for having filed the California Action against NHF and for

failing to obtain Bankruptcy Court prior approval to bring Exculpated Claims

against the Directors and Officers.  (Bankr. Dkt. 1071)[5]

## V.    STATEMENT OF FACTS

### A.    Prior To Bankruptcy, NHF Was A Public Charity With A Mission To Help Administer Charitable Donations And Projects.

NHF's mission has always been to help further progress of scientific,

charitable, educational, and religious activities by consolidating and centralizing

the administration of charitable donations and projects.  (JA490)  NHF made

charitable grants exceeding $20 million in 2006, 2007 and 2008.  (*Id.*)

Additionally, in the years preceding its bankruptcy, NHF received a yearly average

of $11-$12 million of charitable donations.  (*Id.*; RO ¶8, JA1542)

Primarily, NHF accomplished its mission by administering and maintaining

Donor Advised Funds (each fund, a "DAF").  (JA490)  By law, a DAF is owned

and controlled by a sponsoring charitable organization that separately identifies

contributions made by a specified donor or group of donors.  26 U.S.C.

§4966(d)(2).  Upon making a contribution to a DAF, by definition, a donor must

relinquish all right, title, and interest in the assets, in exchange for a 100% dollar-

for-dollar tax deduction at the time the donation is made.

---

[5] This Court may take judicial notice of these lower court orders and related transcripts.  *See United States v. Simpson*, 1996 U.S. App. LEXIS 13570, at *2 (4th Cir. June 7, 1996) (judicial notice of transcript); *Colonial Penn Ins. Co. v. C*oil, 887 F.2d 1236, 1239 (4th Cir. 1989) (judicial notice of filing).

Prior to seeking bankruptcy protection, more than 9,000 donors established DAFs maintained at NHF. (JA984) The Behrmanns and Anderson are two such donors.

Separately, in the late 1990s and early 2000s, NHF entered into approximately 114 charitable gift annuity contracts with annuitants ("Annuitants"), who paid NHF a lump sum amount. In turn, NHF obligated itself to make periodic payments to that Annuitant until the Annuitant died. (JA491; RO ¶¶10-12, JA1543)

Like other organizations, throughout its history, NHF was run by its Directors and Officers. Before its bankruptcy, NHF's Directors and Officers included the following members of the Houk family: Janet Ridgely (Vice-President), Dr. J. T. Houk II (CEO and Board member), Dr. Marian Houk (Chief Operations Officer and Board Member), John T. Houk III (President and Board Member), and Julie Ann Houk (Board Member). (JA932; RO ¶¶2-6, JA1542)[6] Each of them has professional and educational achievements making him or her highly qualified to serve. Before joining NHF, Ridgely had extensive background in marketing, development, communications, operations and administration.

---

[6] Dana Fenton was a Board Member at the time of Confirmation who was not a Houk family member. (RO ¶¶2, 6, JA1542) He had expertise in government affairs. (JA931)

(JA933)  She holds a Bachelor's Degree in Psychology and Biology from the University of Virginia and a Masters Degree in Nutrition from Bastyr University. Dr. J.T. Houk II was a Fulbright Scholar.  He has a Ph.D. in Economics from American University, a J.D. and an MBA and worked his entire life in the non-profit industry.  (JA932)  Dr. Marian Houk holds a Bachelors Degree from Brown University in English and a Ph.D. in Early Childhood Education from American University.  She worked for more than 30 years as an administrator of a 501(c)(3) child-care organization before joining NHF.  (JA930)  Julie Houk is an expert in web development with a background in marketing communications.  (JA931) Finally, John T. Houk III has extensive networking, operations, and technical development expertise, including a Bachelor's Degree in Marketing Communication from Virginia Tech University.  (JA930-31)

### B.    A Lawsuit That Later Proves To Have Been Corrupt Forces NHF To Seek Bankruptcy Protection.

In 2006, NHF was sued in Texas State Court by a disgruntled donor, Dr. Juan and Silva Mancillas ("Mancillas Family"), who alleged that NHF had not made full disclosures to them, notwithstanding communications between the family's attorney and NHF.  (JA492; RO ¶¶14-15, JA1543)  At trial, the jury decided for the Mancillas Family, and, on October 9, 2008, the Texas State Court entered final judgment awarding them more than $6 million.  (JA493; RO ¶14, JA1543)  Although NHF believed that the jury verdict was entirely erroneous and

began its appeal, in order to stay collection, NHF was required to post bond. While NHF was taking steps to accomplish this, the Mancillas Family obtained an *ex parte* order from the Texas State Court freezing NHF's bank operating account. (JA493)

Unable to obtain an appeal bond in order to stay enforcement of the judgment, and unable to secure any defense costs from its insurance carrier, NHF filed its voluntary Chapter 11 bankruptcy petition on January 24, 2009. (RO ¶15, JA1543) The bankruptcy was assigned to Judge Mitchell, who then presided over proceedings.

Well after it was forced into bankruptcy, NHF learned that the Texas State Court judgment appears to have been tainted by criminal misconduct by the Court and others. Judge Abel Limas of the Texas State Court, who presided over the matter, pled guilty to eight counts of racketeering on March 31, 2011. (JA1519-23, 1537-40) He admitted taking bribes in this case. (JA1525) An attorney in the case, Ray Marchan, was found guilty on June 18, 2012, of racketeering and other crimes in connection with that case and others. (JA1581) Marchan committed suicide directly before having to report to prison.[7] *See*

---

[7] Except for the article regarding Marchan's suicide, which occurred after briefing in the District Court appeal was complete, these materials were included in NHF's Appendix in its appeal to the District Court (Dkt. 4-1), and may be judicially noticed. *E.g.*, *Consolidated Gas Supply Corp. v. Federal Energy*

www.dailymail.co.uk/news/article-2286739.

### C.     NHF Takes Steps To Reorganize Through Bankruptcy.

The Bankruptcy Court established a Bar Date for filing proofs of claim.

(JA1; RO ¶16, JA1543)  After evaluating timely-filed proofs of claim, NHF

proposed a voluntary plan of reorganization that allowed NHF to restructure its

existing financial obligations and successfully emerge from bankruptcy as a

reorganized debtor.

### 1.     All Of NHF's Donors Had Proper Notice And An Opportunity To Pursue Claims.

NHF provided its more than 9,000 donors and other parties-in-interest notice

of both the bar date and its plan of reorganization.  At the Confirmation Hearing,

the Bankruptcy Court took judicial notice of those steps.  (JA908-10)  These

included:

- Mailing copies of the Notice of Meeting of Creditors, Notice of Bar Date, and a blank proof of claim form to the last known address of NHF's donors and other parties-in-interest.  (JA1)

- Mailing a summary of NHF's Plan to the last known address of NHF's donors and other parties-in-interest.  (JA671)

- Publishing notice of NHF's Plan and disclosure statement in a newspaper of national circulation, USA TODAY.  (JA853)

In all, 343 Proofs of Claims were filed.  (RO ¶17, JA1544)  Besides one

---

*Regulatory Com.*, 653 F.2d 129, 133 n.9 (4th Cir. 1981) (taking notice of facts in newspaper article).

secured claim and the Mancillas Family's claim, generally, the remaining Proofs of Claims were classified as either "Annuitant Claims" or "Donor Claims." (JA499-501; RO ¶¶18-24, JA1544-45)  NHF objected to all Donor Claims on the basis that donors had parted with legal title to the donated funds upon donation and therefore had no "right of payment" and were not creditors of NHF (*See* Bankr. Dkt. 273; RO ¶21, JA1544)  That said, the Bankruptcy Court still allowed the Donors the opportunity to challenge NHF's objection in a hearing.  The Bankruptcy Court sustained some, but not all, of NHF's objections to the Donor Claims.  (Bankr. Dkt. 652; RO ¶22, JA1544-45)

### 2.      The Behrmanns Settle Their Claim, While Anderson Forfeits Hers.

For those donors who responded to NHF's objections to their claims – including the Behrmanns – their claims were not disallowed and instead were classified as "Pending Donor Claims." (Bankr. Dkt. 655, RO ¶23-24, JA1545)  The holders of Pending Donor Claims were allowed to litigate whether they had valid claims.  For instance, the Bankruptcy Court scheduled a hearing regarding the Behrmanns' claim.[8]  Directly before that hearing, the Behrmanns settled with NHF and voluntarily withdrew their claim.  (Bankr. Dkt. 948; RO ¶29, JA1545)  Even

---

[8] It should be noted that the Behrmanns and their counsel fully participated in the bankruptcy case and confirmation process, including raising certain objections.  Judge Mitchell confirmed the Plan and overruled the Behrmanns' objections otherwise.

though the Behrmanns voluntarily settled their claim, they continue to fight the enforceability of the Releases to try to re-raise the same claims against NHF's Directors and Officers.

The Bankruptcy Court disallowed Anderson's claim because she filed her claim late. (Bankr. Dkt. 744; RO ¶¶34-37, JA1546) She appealed that decision and lost both before the District Court and this Court. *Anderson v. NHF*, 439 F. App'x. 238 (4th Cir. 2011), *cert. denied*, 132 S. Ct. 850 (2011). Anderson, too, fights the enforceability of the Releases so that she may sue NHF's Directors and Officers for claims she forfeited against NHF itself, essentially seeking two bites at the apple.

### 3.    <u>The Only Impaired Classes Support The Plan.</u>

As is typical in a bankruptcy proceeding, NHF's plan of reorganization was periodically amended and refined through the plan confirmation process and negotiation with various creditor constituencies. The Plan's structure provided for payment to three classes of unsecured claims: (a) Class III(A), consisting of the Mancillas Family's claim; (b) Class III(B), consisting of Annuitants' Claims; and (c) Class III(C), consisting of other general, unsecured claims, including the Pending Donor Claims. (JA436-485, 621-70) Although the Behrmanns and their counsel fully participated in the plan confirmation process and raised certain objections, nobody objected to the Plan's classification system.

NHF filed its Plan on October 13, 2009.  (JA621-70)  This incorporated minor technical changes to the prior version.  It created two impaired classes of claims – the holders of the only claim in Class III(A) – the Mancillas Family – and the Annuitants in Class III(B).  Both voted overwhelmingly to accept the Plan:

- The Class III(A) claimant – the Mancillas Family – announced during the Confirmation Hearing that they reached an agreement with NHF to voluntarily impair their claim.  They confirmed that they supported the Plan, notwithstanding the impairment of their claim.  (JA904-05)

- More than 96% of the Annuitants in Class III(B) voted to accept the Plan, with only one Annuitant voting against it.  (Bankr. Dkt. 670)

For the same reasons that it objected to donors' claims, NHF maintained in the Plan that donors were not "creditors" holding "claims" because each donor had made a completed gift of all right, title, and interest upon donation to NHF.  (JA633-34)  Although it believed donors were not creditors, NHF still classified the Pending Donor Claimants in Class III(C).  "Pending Donor Claims" were the claims of those donors who filed and prosecuted alleged claims.  NHF proposed to pay any such claim – if ultimately allowed over the Debtor's objection – in full, plus interest.  (RO ¶42, JA1547, JA632)  Therefore, the Pending Donor Claims in Class III(C) were unimpaired under the Plan and deemed to accept the plan pursuant to 11 U.S.C. §1126(f), which provides that claims that are unimpaired are conclusively deemed to have accepted a plan, and not entitled to vote.  (RO ¶42 & n.4, JA1547)

### D. NHF's Duty To Indemnify And Advance Defense Costs For Claims Against Directors And Officers Makes The <u>Releases Essential</u>.

NHF's bylaws specifically provide for the advancement of defense costs and the indemnification of its Directors and Officers to the fullest extent allowed under the Georgia Non-Profit Corporation Code. (JA978-79; RO ¶48, JA1548) Under Georgia law, a non-profit corporation may provide for the advancement of defense costs to or the indemnification of its officers and directors. GA Code §14-3-858(a) ("A corporation may, by a provision in its articles of incorporation or bylaws or in a resolution adopted or a contract approved by its board of directors or members, obligate itself in advance of the act or omission giving rise to a proceeding to provide indemnification or advance funds to pay for or reimburse expenses consistent with this part."); GA Code §14-3-856(a)(2) (providing that bylaws may provide indemnification and advancement of expenses for officers). (RO p.16, JA1556) The Plan's terms reinforce this. Section 7.22 provides:

> Indemnification. The Debtor and Reorganized Debtor shall indemnify and hold harmless all members, officers, directors, advisors, attorneys, affiliates, representative, agent, financial advisors or employees to the fullest extent available under applicable law or the Debtor or Reorganized Debtor's organizational documents.

(RO ¶44, JA1547-48)

Sections 7.19, 7.20, and 7.21 of the proposed plan therefore contained release, exculpation, and injunction provisions. The version of these provisions

that was originally proposed in the Plan was broader than that ultimately approved
in the Confirmation Order.  (*Compare* Plan §§7.19-7.21, JA638-40, with JA1068-
71; *see also* RO ¶¶43, 49-51, JA1547, 1549-50)

### E.    Judge Mitchell Hears Evidence Demonstrating That The Releases Are Essential.

On October 13, 2009, NHF filed a written memorandum of law in support of
the confirmation of the Plan, which included evidence supporting the need for the
Releases.  (Bankr. Dkt. 666)

Prior to the Confirmation Hearing, the U.S. Trustee and counsel for the
Behrmanns and Anderson objected to the Plan's Releases and the Exculpation
Provision as then drafted.  (JA427-35, RO ¶45, JA1548)[9]  Counsel for the
Behrmanns and Anderson also argued against these provisions at the Confirmation
Hearing.

At the Confirmation Hearing, NHF's representative and Vice-President, Ms.
Ridgely, testified at length in support of the proposed plan of reorganization,
including the need for the releases.  (JA926-93)  She testified:

> Q  And do you believe that the releases of not only the debtor but
>    its officers and directors as set forth therein are necessary under
>    the circumstances?

---

[9] Initially, the Townsley Foundation also objected to these provisions and
joined in the Behrmanns' and Anderson's appeal of the Confirmation Order.  It
later settled its dispute with NHF and withdrew its appeal.  (Bankr. Dkt. 859)

A   Yes.

Q   And can you please explain them a little bit, as to why?

A   As I'd pointed out in our budget projections, legal fees are – they're a reality of life but as a reorganized debtor we would like to reduce those expenses and be free of the strain and constraint of continuing to fight legal battles and get focused on charitable giving and doing what we need to do.

    Those same officers and directors are going to be part of the reorganized debtor and there's concern among those folks of their risks personally and nobody wants that hanging over their shoulders moving forward.

Q   Do you believe that the services of these existing officers and directors are essential to the success of the reorganized debtor?

A   I do.

Q   Do you think if there was an ability for third parties to bring lawsuits or other actions relating to the debtor that that might render those officers and directors unwilling to serve?

A   Absolutely.

Q   Are you aware of the indemnification provisions that are set forth in the debtor's charter documents...?

A   Yes.

Q   And are you aware of the indemnification provisions set forth in the plan?

A   Yes.

Q   And is it your understanding that those indemnification provisions would require the debtor to indemnify its officers and directors for costs and expenses and liabilities relating to causes of action brought against those individuals?

A   Yes.  I understand.

***

Q   Is there a particular group of people that you're concerned with that might bring claims against the debtor's officers and directors?

A   I'm very concerned that other donors may come forward after the bankruptcy.

Q   And do you believe that the donors have claims against the debtor in this case?

A   I don't.

(JA948-50; *see also* RO ¶46, JA1548 (summarizing testimony))

Ms. Ridgely testified as follows in cross-examination:

Q   You mentioned the concerns that the officer and directors have about being sued in the future, after confirmation of this plan. Have any officers or directors actually come forward and said that they will not serve if they don't get these releases?

A   I would say, no.

Q   And the concerns specifically involves the possible donors who have not come forward yet; is that correct?

A   That's correct.

Q   But you did say, if I understood correctly, that the debtor has reserved funds set aside which are intended to deal with those, any potential, future claims of the debtor?

A   No.  That's not correct.

Q   Did I misunderstand that?

A.  Yeah.  My understanding is that we have set aside enough funds for the claims made by certain donors, not unknown ones.

Q   The number of donors who might come forward is a finite number; is it not?

A  If you think 9,000-some people is finite, I suppose.

(JA951-52)

Ms. Ridgely made clear that NHF did not have enough funds in reserve to account for unknown multiple claims brought by its donors.  (JA950-51)

As detailed below, while at the time of Confirmation Hearing donors had not "come forward yet" with suits against Directors and Officers, they since have, as the Behrmanns later "came forward" with their California Action.

After carefully considering the evidence, Judge Mitchell found that NHF had established that a "carefully crafted" injunction would be appropriate to include in the Plan.  (JA1027)  He found:

- NHF's bankruptcy was "quite a unique case."  (JA1018);

- There were "legitimate interests" for approving the Releases in NHF's proposed plan.  (JA1025);

- The Bankruptcy Court could "easily see" a situation where after a claim was disallowed in NHF's bankruptcy, the claimant could nonetheless decide to sue NHF's Directors and Officers "seriatim." (JA1026);

- NHF had obligations to indemnify its Directors and Officers and thus could incur substantial legal costs in defending against such claims. (*Id.*; JA1085);

- The Releases served the purpose of "preventing an end-run around the plan" by allowing dissatisfied claimants to attempt "second and third bites at the apple in another forum."  (*Id.*);

- The potential for lawsuits by dissatisfied claimants created a "potential for mischief" that was "very, very high."  (JA1027)

While he was concerned that the phrasing of the initial releases contained in NHF's proposed plan could be interpreted too broadly, Judge Mitchell said he would entertain a more narrowly-tailored version. (JA1029)

After the first day of the Hearing, NHF submitted a narrower version of the Releases. (JA1068-71, 1076) The U.S. Trustee stated that he was "satisfied" with the carefully drafted language and withdrew his objections to NHF's proposed plan. (JA1076-77) Judge Mitchell agreed that the narrowed Releases were appropriate and served "the purpose of preventing an end-run around the plan… ." and would be approved. (RO ¶49, JA1549; *see also* JA1051, 1085-86)

### F.     The Bankruptcy Court, Per Judge Mitchell, Confirms The Plan, Including The Releases.

As confirmed, the Releases provide in pertinent part as follows:

> 7.19 Release. On the Effective Date, the Debtor, Reorganized Debtor, the Committee, the members of the Committee and their designated representatives in their capacity as such, any of such parties' respective current (i.e., as of the Confirmation Date) officers, directors or employees, and any of such parties' successors and assigns (the "Released Parties") shall not have or incur, and are hereby released from, any claim, obligation, cause of action, or liability to any party in interest who has filed a claim or who was given notice of the Debtor's Bankruptcy Case (the "Releasing Parties") for any act or omission before or after the Petition Date through and including the Effective Date in connection with, relating to, or arising out of the operation of the Debtor's business, except to the extent relating to the Debtor's failure to comply with its obligations under the Plan....

> 7.20 Injunction. The satisfaction, releases, and discharge pursuant to Article VII of this Plan shall also act as an injunction against

any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any claim or cause of action satisfied, released, or discharged under this Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.

Except as provided in this Plan or as expressly approved by the Reorganized Debtor, the Releasing Parties (as defined in Section 7.19) shall be precluded and enjoined from asserting against the Reorganized Debtor, the Estate or the Reorganized Debtor's Assets, any other or further Claim based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date.

(JA1059-60; RO ¶51, JA1549-50)

In the Confirmation Order, Judge Mitchell supplemented his findings made at the Confirmation Hearing, noting that the Releases:

- Were "essential" to NHF's reorganization and appropriate given NHF's "unique circumstances;"

- Were an "essential means" of implementing the Plan;

- Were an "integral element" of the transactions contemplated in the Plan;

- Confer a "material benefit" on NHF, its Estate, and its creditors;

- Were "important" to the Plan's overall objectives; and

- Were consistent with other applicable provisions of the Bankruptcy Code.

(JA1047-48)  The Confirmation Order specifically incorporated the Bankruptcy Court's oral findings at the Confirmation Hearing.  (JA1035)

On October 26, 2009, the Behrmanns and Anderson appealed the

Confirmation Order to the District Court.  (JA1217)  They lost that appeal.  On

August 17, 2010, the District Court, per Judge Hilton, affirmed the Confirmation

Order.  (JA1366)  The Behrmanns and Anderson then appealed to this Court on

August 31, 2010, beginning the *NHF I* appeal.  (JA1367-68)

### G. While This Court Remands For Specific Fact-Finding Supporting The Releases "If The Record Permits," A New Bankruptcy Judge On Remand Rejects <u>The Releases Despite Unequivocal Record Support</u>.

#### 1. <u>This Court Remands For Specific Fact-Finding</u>.

On December 9, 2011, this Court reaffirmed its holding in *A.H. Robins,* 880

F.2d 694, that non-debtor releases are permissible under appropriate

circumstances.  This Court rejected the Behrmanns and Anderson's arguments that

a strict standard should be applied and specifically held that it was "satisfied to

leave to a bankruptcy court the determination of which factors may be relevant in a

specific case."  (JA1535)

This Court recognized that Judge Mitchell had "clearly considered" relevant

factors in "deciding whether to approve" the Releases.  *Id.*  However, it concluded

that it could not exercise "meaningful appellate review" without specific factual

findings that supported the Bankruptcy Court's legal conclusions.  (JA1532)

Therefore, it vacated the Confirmation Order's determination as to the Releases

and remanded for the limited purpose of "allowing the bankruptcy court – if the

record permits it – to set forth specific factual findings supporting its conclusions"

that the Releases and Exculpation Provision were appropriate.  (JA1535)  This

Court did not suggest that the underlying Confirmation Hearing record was

deficient or that further evidence was necessary.

### 2. Judge Kenney Rejects Judge Mitchell's Legal Conclusions And Rules That The Releases Are Unenforceable.

As of the time of remand, Judge Mitchell had retired and the case was re-

assigned to Judge Kenney.  Before Judge Kenney, the parties agreed to stand on

the existing record (Op. 7, JA1824) Judge Kenney therefore reviewed the same

record, facts and law as had Judge Mitchell but reached the exact opposite result,

concluding that the Releases were impermissible.  (RO pp.12-24, JA1552-64)

Judge Kenney considered the factual record assembled by Judge Mitchell in

light of each of the *Dow Corning* factors.[10]  He agreed that the first factor –

whether there is an identity of interests between the debtor and released parties –

was met because of "the indemnity and advancement obligations of the corporation

to its officers and directors."  (RO p.15, JA1558)  Regarding the second factor –

whether the non-debtors have contributed substantial assets to the reorganization –

he rejected that the Directors and Officers' continued service was a sufficient

contribution, even in a unique case like this where creditors with allowed claims

---

[10] Six of these are substantive.  The seventh factor is the requirement of specific factual findings.

were paid in full.  (RO p.18, JA1558)  Regarding the important third factor –

whether the injunction is essential to reorganization – he found it was not because

"none of the officers said they would in fact leave."  (RO pp.18-20, JA1558-60)

Regarding the fourth factor – whether the impacted class voted overwhelmingly to

accept the Plan – he found that the "impacted" class were all "donors" – whether or

not they filed or properly preserved their claim – and concluded that they had not

voted to accept the Plan.  (RO pp.20-22, JA1560-62)  Because Judge Kenny

incorrectly concluded that all donors were creditors, he also found that the Plan did

not provide a mechanism to pay for all or substantially all of the class or classes

affected by the injunction, or an opportunity for those claimants who chose not to

settle to recover in full (factors five and six).  (RO pp.22-24, JA1562-64)

### 3.    <u>Judge Kenney Stays His Ruling</u>.

Despite ruling against NHF on the merits, Judge Kenney agreed that NHF

met the requirements for a stay pending appeal, granting this on October 25, 2012.

(JA1573-80)  He agreed that the risk of multiple donor suits and NHF's duty to

advance fees and costs for such suits satisfied the irreparable injury element.  He

agreed that as to likelihood of success, NHF had presented a substantial non-

frivolous argument on appeal because the law concerning non-debtor releases is

one "about which much has been written, and is in some state of development at

the present time."  (JA1575)

### H.   On Appeal, A New District Judge Reaches The Opposite Result From The Prior District Judge.

NHF's appeal of the Remand Order was assigned to a new District Court Judge, Judge Trenga.  On April 3, 2013, he issued the District Court Order now on appeal.  (JA1838-39)  Judge Trenga agreed with Judge Kenney that the Releases were not supported by the record.  He clearly reviewed Judge Kenney's "fact findings" under a "clearly erroneous" standard but stated that even a more detailed consideration of the record did not support the Releases.  (Op. 8-9 & n.6, JA1825-26)  He emphasized that the parties had not reopened the record although given an opportunity to do so.  (Op. 7, 10, 13, JA1824, 1827, 1830)

Like Judge Kenney, Judge Trenga addressed each *Dow Corning* factor but rejected Judge Kenney's conclusion that even an identity-of-interest had been established and found that all factors showed the Releases to be impermissible.  Judge Trenga also found that NHF had not shown that it was in any different position relative to its Directors and Officers "from any corporation with a duty to indemnify its officers and directors."  (Op. 11-12n.9, JA1828-29)  While Judge Kenney had agreed that "multiple donor suits" were a "near certainty," Judge Trenga disagreed and found that there was "no evidence in the record that NHF's directors and officers are facing or would, in fact, face claims that would trigger indemnification obligations on the part of NHF so onerous as to threaten the prospects of successful reorganization."  (Op. 12, JA1826)

### I.     Both Lower Courts Now Acknowledge The Danger That Suits Like The Behrmanns' California Action Pose To NHF.

#### 1.     The Bankruptcy Court Holds The Behrmanns In Civil Contempt For Filing The California Action.

At the time he issued the Remand Order in August 2012, Judge Kenney did not know that two months before this – in June 2012 – the Behrmanns had filed their California Action. The Behrmanns only disclosed the California Action to Judge Kenney in October 2012. (Bankr. Dkt. 1035)

In the California Action, the Behrmanns sued NHF (despite its discharge under the Plan) and its Directors and Officers. They sought to sue on behalf of a class of similarly-situated donors with a DAF and raised claims for RICO, fraud, breach of fiduciary duty, unfair trade practices and multiple other theories.[11] They sought treble damages and attorney's fees for their RICO claim, as well as punitive damages.

Because the Behrmanns filed the California Action against a discharged debtor after their counsel promised Judge Kenney in March 2012 they would not do so, (Bankr. Dkt. 1047) and in violation of the requirements of the Exculpation Provision that they secure prior court approval before bringing any suit, on December 4, 2012, Judge Kenney issued an order to show cause why the

---

[11] The complaints in the California Action are found at Bankr. Dkts. 1043-2 and 1043-3.

Behrmanns and their counsel should not be held in civil contempt. (Bankr. Dkt. 1071) He held an evidentiary hearing on this issue on May 1-2, 2013. (Bankr. Dkt. 1175-76)

On June 21, 2013, the Bankruptcy Court issued its Contempt Order finding the Behrmanns and their counsel to be in civil contempt for filing the California Action. (Bankr. Dkt. 1187) The Bankruptcy Court ordered the Behrmanns to dismiss the California Action and to pay $278,098.53 to NHF to defray its legal expenses associated with that wrongful filing.[12]

### 2.    The District Court Stays Its Order Pending Appeal

Also on June 21, 2013, the District Court issued a stay of its Order pending this appeal. (Fourth Circuit Dkt. 20) At the time of this filing, we are still waiting for the transcript from that hearing. The District Court emphasized, however, that it was displeased that the Behrmanns had concealed the filing of the California Action from Judge Kenney and that the California Action showed the kind of claim donors might bring against NHF and the risk this posed to NHF's viability.

## VI.    SUMMARY OF ARGUMENT

After liability in a single donor lawsuit forced NHF to seek bankruptcy protection (a lawsuit that later proved to involve criminal bribery) it was especially

---

[12] The Behrmanns have appealed that order to the District Court. (Bankr. Dkt. 1200)

important to the success of NHF's reorganization to minimize its exposure to future suits based on pre-bankruptcy conduct. This was particularly true since NHF had 9,000 donors and if one could sue NHF successfully, others might follow. But as set forth above, donors could equally injure NHF by suing its Directors and Officers. Thus, NHF would not be adequately protected unless suits against its Directors and Officers also were enjoined.

NHF therefore included in its Plan Releases that would protect both it and its Directors and Officers against liability for conduct occurring prior to Confirmation. It presented unrebutted testimony demonstrating the necessity of this relief. The Bankruptcy Court and the U.S. Trustee took an active role in ensuring that the Plan's Releases were properly narrowed.

Judge Mitchell agreed that the Releases (1) were "essential" to NHF's reorganization and appropriate given NHF's "unique circumstances;" (2) were an "essential means of implementing the confirmed plan;" (3) were an "integral element" of the transactions contemplated in the Confirmed Plan; (4) conferred a "material benefit" on NHF, its bankruptcy estate and its creditors; (5) were "important" to the Plan's overall objectives; and (6) were "consistent with applicable provisions of the Bankruptcy Code." (JA1535) In the first appeal, Judge Hilton agreed with Judge Mitchell's findings.

What Judge Mitchell failed to do, however, is set forth specific and detailed

factual findings supporting his legal conclusions in the Confirmation Order. Such findings are especially important as to equitable relief such as the Releases, as this Court has noted that non-debtor releases "should be granted cautiously and infrequently." Because of this procedural flaw, in *NHF I*, this Court vacated the Confirmation Order as it applied to the Releases and remanded "to allow the Bankruptcy Court" to correct that error. The Court did not opine on the adequacy of the underlying record and left for the Bankruptcy Court to determine "if the record permit[ted]" the Releases. (JA1535)

Here, the record amply permitted the Releases. The evidence showed that:

- The Mancillas donor lawsuit by itself was enough to force NHF into bankruptcy. (RO ¶¶14-15, JA1543) After Confirmation, it was learned that this lawsuit was tainted by criminal bribery of the judge and a participating attorney (JA1519-27, 1537-40), showing that a lawsuit does not have to be valid to be catastrophic.

- NHF was obligated to advance defense costs and indemnify its Directors and Officer each time they were sued, meaning NHF faced direct injury from such suits. (RO ¶¶44, 48 & p.16, JA1547-48, 1556)

- The Behrmanns and Anderson objected to the plan because it restricted their ability to sue non-debtors. (JA574-94, 615-20)

- NHF had 9,000 other donors. (JA951-52) Many had filed claims. (RO ¶17, JA1544) Donors with failed or settled claims as to NHF would be particularly likely to sue. (JA1085)

- NHF did not have funds reserved to pay for unknown suits. (JA951-52)

Despite these facts, a new judge on remand, Judge Kenney, found the

Releases to be unenforceable and a new District Court judge on appeal, Judge Trenga, affirmed. Their rulings cannot stand for several reasons:

First, the District Court improperly applied the clearly erroneous standard of review to Judge Kenney's analysis of the previously assembled factual record even though this Court's precedent requires *de novo* review. *Henry A. Knott Co. v. Chesapeake & Potomac Tel. Co.,* 772 F.2d 78, 85 (4th Cir. 1985). The District Court, therefore, gave Judge Kenney's conclusions unwarranted deference.

Second, both Courts below erred by jettisoning Judge Mitchell's analysis and legal conclusions even though he had presided over the entire Bankruptcy and actually heard the evidence, and even though the facts, record and governing law remained the same. *A.H. Robins* holds that when two courts reach inconsistent results on the same facts, it creates doubt about the law's fairness. Had the Courts on remand properly reviewed the record, they would have avoided this risk.

Third, if one properly considered the *Dow Corning* factors in light of the Confirmation Hearing record, it is clear each factor was plainly met. As to the "identify of interest" factor, there is an identity of interests between NHF and its Directors and Officers arising from NHF's duty to advance defense costs and to indemnify. Each time its Directors and Officers are sued, NHF unquestionably bears the costs.

Both Courts below erred in finding that the Directors and Officers had not

made a substantial contribution to support the Releases – the second *Dow Corning* factor.  As the Plan paid creditors with allowed claims in full, there were no additional funds for the Directors and Officers to provide.  Uncontroverted testimony showed that the skills and efforts of such Directors and Officers were necessary to NHF's success.  The Courts below erroneously rejected authority holding that "sweat equity" is sufficient contribution under such circumstances.

Both Courts erroneously found that the Releases are not "essential to NHF's reorganization."  Rather, the same facts that create an identity of interests demonstrate that the Releases are essential.  Judge Mitchell was indisputably correct that, absent the Releases, NHF's donors can mount an "end run around the plan" and pursue "second and third bites at the apple," targeting NHF indirectly by suing its Directors and Officers.  While recognizing that multiple donor suits were a "near certainty," Judge Kenney overlooked that the costs of such suits would imperil NHF's ability to operate.  He concluded that the Releases were not essential because he believed – despite evidence demonstrating otherwise – that the Directors and Officers would serve NHF going forward even if they faced multiple personal lawsuits.

The District Court made an additional error in holding that the Releases are not essential.  Disregarding the evidence of the *Mancillas* suit and other evidence discussed above, it stated erroneously that the record contained "no evidence" that

donors would sue or what the cost of this would be.

The Behrmanns, by bringing their California Action, subsequently proved that Judge Mitchell was prescient in worrying that, absent the Releases, the "potential for mischief" was "quite high" from donors who might otherwise sue NHF's Directors and Officers "*seriatim.*"

Indeed, the response of the Courts below to the Behrmanns' California Action shows their growing understanding of the Releases' importance. Both Courts agreed that NHF merited a stay pending appeal and the Bankruptcy Court found the Behrmanns to be in contempt for filing that Action.

Finally, both Courts on remand erroneously concluded that the Plan lacked creditor support. Donors who successfully asserted claims were separately classified as unimpaired in the Plan in such a way that they were deemed to accept the Plan and therefore not entitled to vote. Nobody objected to this classification system established by the Plan. Donors who filed and prosecuted "claims" had such claims disallowed after objection by the Debtor or voluntarily settled their claims. Donors who did not file claims – or had their claims disallowed – are not "creditors" and do not hold "claims," 11 U.S.C. §101(5), (10), and their views should not (and indeed cannot) be evaluated in determining "creditor" support for the Plan under the *Dow Corning* factors. Had the Courts below applied the proper standard, it is clear that the remaining *Dow Corning* factors were satisfied, as the

two impacted classes in the Plan overwhelmingly voted for the Plan and the Plan provided a mechanism to pay all Pending Donor Claimants in full plus interest for those who prosecuted and established allowed claims. None did. All disputed donor claims that were filed in the bankruptcy case were either objected to and disallowed or resolved by voluntary compromise, including the Behrmanns'. Donors who simply chose not to participate in the bankruptcy case, notwithstanding notice and an opportunity to do so, should not be considered in evaluating the *Dow Corning* factors and "creditor" support for the Plan. To allow otherwise undermines the entire bankruptcy process.

Therefore, this Court should reverse the Remand Order and instead declare the Releases to be enforceable and supported by proper fact.

## VII.  ARGUMENT

### A.  The District Court Applied An Improper Standard Of Review Of The Remand Order.

NHF argued to the District Court that because Judge Kenney reviewed the record after it was already assembled, both his factual findings and legal conclusions should be reviewed *de novo*. The District Court agreed that Judge Kenney's legal conclusions should be reviewed *de novo*, but erroneously reviewed his "factual findings" under the clearly erroneous standard of review. (Op. 8-9 & n.6, JA1825-26) This ignored this Court's precedent. In *Henry A. Knott, Co.,* 772 F.2d 78, this Court stated:

> *Deference to the trier of fact, that is, the person who sees the witness and hears the testimony,* is an essential feature of the adversary trial and the notion that the person who hears the testimony should be the person who decides the case is part of our conception of a fair trial. *The problem of the successor judge…is that one person hears the testimony and another person makes the factual findings without having seen or heard the witnesses…. Deference to such findings, by a district court or an appellate court, would be misplaced in such a case.*

*Id.* at 85 (emphasis added); *see also Bankcard Am., Inc. v. Universal Bancard Sys.*, 203 F.3d 477, 481 (7th Cir. 2000) ("[b]ecause [the district judge] did not preside over the first trial, he enjoyed no special advantage in determining credibility and gauging the evidence – he read the record, just as we have now done"). The District Court relied upon inapposite cases where, unlike here, the lower court actually took evidence and presided over a factual hearing. (*See* Op. 8, JA1825 (citing *In re Harford Sands, Inc*, 372 F.3d 637 (4th Cir. 2004); *In re Phinney*, 405 B.R. 170, 173, 175 (E.D.Va. 2009)))

Perhaps recognizing the vulnerability of its position, the District Court noted that it had "reviewed the record in detail" and affirmed Judge Kenney's factual findings even if a *de novo* review applied. (Op. 8 n.6, JA1825) Yet, one cannot be both deferential and non-deferential at the same time, and a review of the District Court's Opinion shows that it failed to grapple with several key record facts, including:

- Both lower Courts acknowledged that the liability in the Mancillas donor lawsuit was $6 million. (RO ¶14, JA1543; Op.

3 & n.2, JA1820)  This liability caused NHF's bankruptcy in the first place.  Even in Bankruptcy, the Mancillas Family received $3 million. (JA928)

- The record also showed there are 9,000 other donors.  (JA951-52)  Many filed claims in the Bankruptcy, which as the Courts below noted, amounted to many millions of dollars.  (*See* RO ¶17 (Proofs of claims amounted to $51,512,086.79), JA1544; Op. 3 n.2, JA1820)  These donors plainly would be motivated to sue NHF's Directors and Officers if this were another avenue of funds, especially given the Mancillas Family's success.

- The Behrmanns and Anderson had objected to the Plan because the Releases barred claims as to third parties.  (JA584, 615-20)

- NHF did not have funds reserved to pay for unknown suits. (JA951)

The District Court's failure to apply the proper standard of review, standing alone, requires reversal.

### B.    A Change In Judge Should Not Lead To A Different Result On The Same Record; Yet That Is What Happened Here.

In *NHF I*, this Court found that the absence of formal findings of fact supporting the Bankruptcy Court's conclusion as to the Releases made the appellate record insufficient for it to determine whether these provisions were justified by the necessary special circumstances.  (JA1535)  This Court vacated the Confirmation Order with regard to these provisions and remanded the case to the Bankruptcy Court, stating:

> We find … that the bankruptcy court's ultimate decision to grant equitable relief lacks adequate factual support....  Indeed, without more, the court's conclusions could apply just as well to any number of reorganizing debtors.  *Because the present record does*

> *not allow us to assess – under any standard of review – whether NHF's circumstances entitle it to the benefit of the Releases, we must vacate the district court's judgment and remand the case to allow the bankruptcy court – if the record permits it – to set forth specific factual findings supporting its conclusions.*

(*Id.*) (emphasis added)

What was missing from the Confirmation Order, therefore, was procedural and not substantive in nature. The Confirmation Order itself does not include the necessary, specific facts as to the Releases. (JA1033-67) This Court remanded because it is for a lower court and not an appellate court to make appropriate findings of fact. *See Columbus-AM Discovery Group v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 575-76 (4th Cir. 1995). The task given by this Court to the Bankruptcy Court on remand, then, was to make specific factual findings supporting the Releases if permitted by the record.

The Court's decision to "vacate" is important here, as such a ruling that undeniably permitted the Releases to stand after remand. *See United States v. M.C.C. of Florida, Inc.*, 967 F.2d 1559, 1562 (11th Cir. 1992) (a vacation does not "nullify all prior proceedings," but "merely require[s]" a court "to reconsider" its ruling in light of the appellate court's direction).

What usually happens after remand is that the judge who previously decided the matter also addresses the issues on remand. Here, had Judge Mitchell not retired, it seems clear that he would have approved the Releases, just as he had

originally.  This Court's order anticipates this, as it "allowed" the Bankruptcy Court to make findings "supporting its conclusions."  (JA1535)  Because of Judge Mitchell's retirement, however, Judge Kenney presided in the Bankruptcy Court on remand.

To be sure, this Court left open the possibility that the record might not support the Releases, but that was plainly not the expectation.  Indeed, this Court emphasized at least six separate conclusions Judge Mitchell had articulated about the importance of the Releases.  (*Id.*)

A change in judges should not lead to a polar opposite result on the same facts, record and law.  Yet, that is what happened here.  Judge Kenney rejected the legal conclusions Judge Mitchell had drawn from the same record.  Then, while Judge Hilton had agreed the Releases were enforceable in the first appeal, Judge Trenga held they were not.

In *A.H. Robins*, this Court noted that the goals of uniformity and predictability are ill-served if different judges can reach inconsistent results on the same facts:

> But if various fact-finders reach inconsistent conclusions about the same set of facts, the defendant (and others in similar circumstances) is left without any guidance concerning the legality of its conduct, which may serve important legitimate aims…. But defendants and plaintiffs alike have compelling interests in consistent liability determinations, interests that can and should be addressed.

*A.H. Robins*, 880 F.2d at 742 (citation omitted).  If left to stand, the orders below

would cause the very inconsistency that this Court in *A.H. Robins* urged courts to

avoid.

The District Court misconstrued this Court's statement that bankruptcy

court's ultimate decision "lacks adequate factual support" to mean that the

underlying factual record from the Confirmation Hearing lacked critical evidence.

Thus, the District Court in several places stressed that the parties had stood on the

existing record and stated that this Court's statement in *NHF I* that the

Confirmation Order lacked factual support "effectively foreclosed" NHF's position

that its reorganization would fail without the Releases.  (Op. 13, JA1830 (quoting

*NHF I*, 663 F.3d at 713-14))  Similarly, the District Court concluded that this Court

had identified a "glaring defect in the factual record" and stressed that NHF had

failed to offer on remand any additional evidentiary support for its position."  (Op.

13, JA1830)

But this Court in *NHF I* made clear that the problem was that it could not

"meaningful[ly] review" the record, not that it had looked at the record and found

it wanting.  (JA1532)  Indeed, this Court's reference to "if *the record* permits"

presupposed an existing record.

Here, NHF justifiably stood on the existing record as it unequivocally

demonstrates the need for the Releases, just as Judge Mitchell had vociferously

found. The District Court is simply incorrect in holding that there is "no evidence"

in the record that NHF's Directors and Officers "would, in fact, face claims that

would trigger indemnification obligations on the part of NHF so onerous as to

threaten the prospects of a successful reorganization." (Op. 12, JA1829)

As noted above, the Mancillas case showed the harm donor lawsuits would

cause and the sheer number of possible donor litigants was undisputed. Judge

Mitchell also rightly recognized the donors would be especially incentivized to sue

if NHF prevailed on its argument in objecting to the Pending Donor Claims that

the donors could not proceed against NHF for some reason. As he explained:

> Although it's a close case, I feel that as narrowed here that it is
> appropriate and serves the purpose of preventing an end-run
> around the plan by simply allowing people to take claims that may
> have been disallowed or determined not even to be claims. If for
> example the ultimate ruling – and we're dealing here with the
> donor claims. If they're determined in connection with any
> litigation in this court to have made a gift, the notion that they
> could then turn around and sue an officer and director and attempt
> to litigate in some other forum the question of whether or not it
> was a gift. In the meantime the debtor has its indemnity
> obligations to the officers and directors and so the debtor would be
> forced to expend attorney fees to defend against the second and
> third bites at the apple in another forum. I think there's sufficient
> danger of that to justify the release provision here as it has been
> considerably narrowed from what was set forth in the plan.

(JA1085)

Indeed the Behrmanns and Anderson prove Judge Mitchell's point. Judge

Mitchell knew that Anderson had forfeited any claim as to NHF, as he dismissed

her claim as untimely.  Yet, she objected to the Plan because it foreclosed suits against Directors and Officers.  (JA615-20)  Similarly, the Behrmanns withdrew their claim against NHF after receiving a settlement which paid their designated charity $590,000.  Yet, they, too, objected to the Plan on the same ground. (JA574-94)  It defies logic to put NHF at risk to protect those who through their own dereliction or choice lost or settled their claims with NHF.

Accordingly, NHF had advised the District Court of the California Action and argued that this confirmed the Releases' necessity.  (*See* Dkt. 4 at 34)  While the District Court did not address the California Action in its Opinion, it noted the injury it could cause in later granting a stay.  This damage is quantifiable.  While Judge Kenney's Contempt Order awarded NHF $278,098.53 of fees and costs it has incurred in connection with that California Action (which the Behrmanns have yet to pay), this is only a fraction of the total fees that suit has forced NHF to incur. (Bankr. Dkt. 1167)  It plainly would not take many similar donor suits to cause NHF to again fail.

The record thus "permitted" the Bankruptcy Court on remand to set forth specific facts upholding Judge Mitchell's findings and the lower Courts below erred by finding otherwise.

### C.   This Circuit Has Long Approved Of Releases In Favor Of Non-Debtors In Appropriate Circumstances, And The Record Shows Such Circumstances Exist Here.

In *NHF I*, this Court reaffirmed its now longstanding holding in *A.H. Robins* that non-debtor releases and injunctions are enforceable in special circumstances. This Court stated, "we have rejected the notion that 11 U.S.C. §524(e) forecloses bankruptcy courts from releasing and enjoining causes of action against non-debtors." (JA1533)  It explained, "11 U.S.C. §105(a) gives a bankruptcy court the power to issue any order, process or judgment that is necessary or appropriate to carry out the provision of this title and confers equitable powers upon bankruptcy courts." *Id.*  This Court underscored that in *Stuart,* 3 F. App'x 38, "[w]e declined to retreat from [*A.H. Robins*'] holding."  (JA1533)

This Court stressed that a case need not present the same circumstances as those found in *A.H. Robins* in order to be entitled to equitable relief.  Instead, it held that "whether a Court should lend its aid in equity to a Chapter 11 debtor will turn on the particular facts and circumstances of the case."  (JA 1534)

This Court noted that courts follow two related tests for evaluating non-debtor releases and injunctions.  The first is the *Dow Corning* test.  (JA1535)  Its factors are:

> (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed

> substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, or the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full.

*Dow Corning*, 280 F.3d at 658.  The other is the related four-part *Railworks* test.

Its factors are:

> (1) overwhelming approval for the plan; (2) a close connection between the causes of action against the third party and the causes of action against the debtors; (3) that the injunction is essential to the reorganization; and (4) that the plan of reorganization provides for payment of substantially all of the claims affected by the injunction.

(JA1535 (citing *Railworks*, 345 B.R. at 536))[13]

While "commending" these cases as "instructive," this Court made clear it is for a bankruptcy court to determine "which factors may be relevant in a specific case."

In rejecting the Releases, both Courts looked at each *Dow Corning* factor but misapplied them to the facts.  A proper application shows that the Releases are appropriate.

---

[13] Judge Kenney correctly noted that the *Railworks* factors are a shortened form of the *Dow Corning* test.  (RO p.14, JA1554)

**1. The "Identity Of Interest" Between NHF And Its Directors And Officers – Supports The Releases.**

In an earlier *A.H. Robins* decision, this Court recognized that the obligation to advance defense costs and indemnify may effectively make the debtor the real party defendant and create the "unusual situation" where releases and injunctions in favor of non-debtors are warranted. This Court explained:

> [T]here are cases [under 362(a)(1)] where a bankruptcy court may properly stay the proceedings against non-bankrupt co-defendants but, ... in order for relief for such non-bankrupt defendants to be available under (a)(1), there must be "unusual circumstances" and certainly "'[s]omething more than the mere fact that one of the parties to the lawsuit has filed a Chapter 11 bankruptcy must be shown in order that proceedings be stayed against non-bankruptcy parties.'" This "unusual situation," it would seem, arises when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor. An illustration of such a situation would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case. To refuse application of the statutory stay in that case would defeat the very purpose and intent of the statute.

*A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986) (citation omitted).

Applying this law, Judge Kenney recognized that an identity of interest exists between NHF and its Directors and Officers arising from NHF's obligation to advance defense costs to its Offices and Directors in suits and indemnify them for losses when sued. (RO p.15, JA1555)

Because of this identity, Judge Kenney recognized the "real possibility" that

"multiple donor lawsuits" against Directors and Officers could have a "materially

negative" effect on NHF's reorganization. He explained:

> Should the Release Provisions be excised from the Plan, there is a
> very real possibility that the officers and directors will be sued by
> the donors, whose numbers run into the thousands. The officers
> and directors would then look to the Debtor for indemnification,
> which would include, among other things, an advancement of legal
> fees to pay their expenses in defending the Donor claims.... [T]he
> officers and directors would be entitled to the advancement of their
> legal fees and expenses, all without any security, and without any
> reference to their ability to repay such amounts.
>
> The real possibility – indeed, the near certainty – of multiple
> Donor lawsuits, coupled with the officers' and directors' rights to
> indemnification and the advancement of legal expenses, could
> have a materially negative impact on the Debtor's ability to
> successfully complete its reorganization.

(RO p.17, JA1557)

The District Court disagreed that even the identity factor was satisfied here

(Op. 11-12 n.9, JA1828-29), reasoning that the record does not place NHF in a

position relative to its directors and officers *any different from any corporation*

*with a duty to indemnify its directors and officers* and, therefore, that NHF had

"clearly failed to demonstrate any 'unusual circumstances' that would justify the

release[s]." *Id*. (emphasis added). This erred for two reasons. First, as *A.H.*

*Robins* demonstrates, the duty to indemnify is itself an "unusual circumstance"

supporting releases. *A.H. Robins* makes clear that the "unusual circumstance" test

compares the debtor to the universe of other debtors, not to that subset of debtors

with indemnity obligations.

Second, the record shows an even greater identity than might exist in other instances where there is a duty to indemnify.  For example:

- NHF has a duty not only to indemnify its Directors and Officers, but to advance costs of their defense in any suit, without receiving any security and without certainty of repayment.  Not all indemnification obligations are as broad.

- NHF failed because of a donor lawsuit.  Not every debtor fails because of liability associated with a lawsuit.

- The Behrmanns and Anderson seek to pursue suits subject to NHF's defense and indemnification obligations.  Not every debtor with indemnification obligations faces identifiable foes poised to sue.

- NHF has 9,000 donors who are similarly situated to Appellees here and who may well sue if empowered to do so.  Not every debtor with indemnification obligations faces such a large universe of potential litigation adversaries.

- NHF does not have resources set aside to pay for costs associated with unknown suits.  Not every debtor with indemnification obligations has such limited resources.

## 2. The Directors And Officers Made A Substantial Contribution Through Their Continued Service.

NHF's Plan paid those with allowed claims in full, plus 4% interest.

(JA928-29)  Therefore, there is no financial contribution that the Directors and Officers could have made to support the Releases – and the Courts below did not suggest otherwise.  Instead, the Directors and Officers contributed their promise of continued service and wealth of experience and judgment.  *In re Mercedes Homes, Inc.,* 431 B.R. 869 (Bankr. S.D. Fla. 2009), holds that this is sufficient to support

non-debtor releases, stating that directors and officers make a substantial

contribution by "continuing to use their expertise and knowledge to work for the

Reorganized Debtors."  *Id*. at 881.[14]

    While both Courts below relied on *Norwest Bank Worthington v. Ahlers*,

485 U.S. 197 (1988), to find that "sweat equity" was not a "substantial asset," (*see*

RO p.18, JA1558; Op. 16-17, JA1833-34), it does not apply.  *Norwest Bank*

concerned an instance, unlike here, where a plan made an exception to the absolute

priority rule and where the debtor was retaining an equity interest in property while

creditors *were not* fully paid.  485 U.S. at 203.

    The District Court additionally relied on a series of other inapposite cases.

(Op. 17, JA1834)  It noted that non-debtors in *Dow Corning* contributed more than

$2 billion in equity, but claimants there too, were not paid in full.  280  F.3d at 659.

The District Court also cited *In re SL Liquidation, Inc*. ("*SL*"), 428 B.R. 799

(Bankr. S.D. Ohio 2010), but that concerned a liquidation bankruptcy, not a

reorganization, and the alleged director and officer contribution was "in the

drafting and negotiating the Plan," not in continued service.  *Id*. at 803.  Finally, in

*In re Exide Technologies*, 303 B.R. 48 (Bankr. D. Del. 2003), unsecured claimants

---

[14] The District Court noted that the directors and officers in *Mercedes Homes* contributed by waiving their claims.  (Op. 16 n.15, JA1833)  Here, however, the Directors and Officers are not claimants.  They stood to get no part of NHF's payment to creditors.  They had nothing to waive.

49

were projected to recover only 1.4% of their claims, not 100% plus 4% interest as those with allowed claims were to receive here.

### 3. The Undisputed Record Evidence Shows That The Releases Are Essential To NHF's Reorganization.

The District Court rightly recognized that the same facts that pertain to whether or not there is an identity of interests also demonstrate whether the Releases are essential to NHF's reorganization but drew the opposite conclusion from what this fact shows.  (Op. 11 n.9, JA1828)  It concluded that the absence of an identity of interests reinforced its conclusion that the Releases are not "essential."  In fact, an identity does exist and shows why the Releases are necessary.

The undisputed record evidence shows that every time a Director or Officer of NHF is sued, this directly harms NHF because of the duty to indemnify and advance costs.  Nonetheless, both Courts on remand below erroneously found that the Releases are not essential to NHF's reorganization.  They emphasized different theories – the Bankruptcy Court emphasized that the Directors and Officers would continue to serve even if subject to suit (RO p.18-20, JA1558-60) (a conclusion with which the District Court agreed) while, as noted above, the District Court emphasized that "no evidence" showed that donors would sue.  (Op. 11-15, JA1828-32)  Both conclusions are wrong.

(a)    **The Record Shows The Certainty Of Costly Donor Suits.**

Judge Mitchell recognized the harm NHF would face if donors were allowed "second or third bites at the apple" by suing NHF's Directors and Officers and thereby saddling it with obligations to defend and indemnify.  NHF would have no control over where such suits were brought, what donors would allege or what damages they would seek.  As noted above, with regard to the "identity" factor Judge Kenney agreed with Judge Mitchell.

These facts indisputably show that donor suits would imperil NHF's ability to continue operations but Judge Kenney failed to address this.  Instead he hypothesized that NHF's Directors and Officers would continue to serve even if they could be sued for their pre-confirmation work for NHF.  This ignores that their continued service would mean nothing if NHF ceased operations.

Similarly, Judge Trenga was simply mistaken in suggesting there was "no evidence" of donor suits against Officers and Directors that would jeopardize NHF.  Again, at the time of Plan Confirmation, the record showed, *inter alia*: (a) the costs associated with the Mancillas Family donor suit; (b) the large number of costly claims that donors had filed; (c) that 9,000 donors could raise similar arguments if allowed to pursue NHF's Officers; (d) that the Behrmanns and Anderson sought to sue Officers and Directors despite having no further rights against NHF itself; (e) that NHF's Officers and Directors believed that, without the

Releases, they would be sued by donors, even though donors had no legitimate basis to bring suit; and (f) that NHF lacked funds to cover such unknown suits.

And, of course, since the time of Plan Confirmation, the Behrmanns filed their California Action and even assumed claims of other donors, tangibly illustrating the kinds of claims donors might make, the relief they would demand and the burdens they would impose absent the Releases.

Because multiple future donor suits could doom NHF's operations, this should have been enough to show that the Releases are essential. The Supreme Court has recognized that preserving going concerns, such as NHF, is one of the foremost policies underlying a chapter 11 bankruptcy. *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999) (recognized policies underlying Chapter 11 include "preserving going concerns"). The Releases also were essential to establish the Plan's feasibility as required by 11 U.S.C. §1129(a)(11). Feasibility means that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan." (*Id.*) Without the Releases, NHF arguably could not have met this requirement, as the Releases allowed NHF to avoid substantial legal costs that could threaten the viability of the reorganization.

This Court in *A.H. Robins* and other courts including *Dow Corning* have

held that the "essential" factor is satisfied where "the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor[.]" *Dow Corning*, 280 F.3d at 658 (citing, *inter alia, A.H. Robins*, 880 F.2d at 701-02). So, after remand from the Sixth Circuit, the District Court in *Dow Corning* found the releases and injunctions there were essential because:

> Any litigation against the Debtor's Shareholders, subsidiaries and affiliates, and the Settling Insurers would greatly impact the Debtor's estate by decreasing funds from the estate for those entities' defense of the claims against them.

*In re Dow Corning Corp.*, 287 B.R. 396, 413 (E.D.Mich. 2002). *See also Mercedes Homes*, 431 B.R. at 882 (finding a release was "necessary to ensure that the Debtors and Reorganized Debtors are not liable for claims against the Directors and Officers under indemnification agreements").

By contrast, as to these factors too, the District Court erroneously relied on *SL*. Most importantly, in *SL*, unlike here, did not include an obligation to advance defense costs with no assurance of repayment. Therefore, the *SL* court concluded that even if the claims against the directors and officers there were meritless or spurious, "the Debtors have nothing to fear because they will have nothing to indemnify." 428 B.R. at 803.

**(b)     The Record Shows That NHF's Directors And Officers Would Not Serve Absent The Releases.**

Both Courts below also erred in finding that the record lacked sufficient evidence to show that NHF's Directors and Officers would not serve if they were subject to suit. (Op. 14, JA1831) Rather, the only fair reading of Ms. Ridgely's unrebutted testimony is that they *would not* serve under such circumstances. *See supra* pp.19-22. That is plainly how Judge Mitchell – who saw her testify – understood that testimony.

The Courts below improperly seized upon Ms. Ridgely's statement that the Directors and Officers had not specifically stated that they would not serve if they could be sued to suggest they would serve. (*See* RO ¶47, JA1548; Op. 14, JA1831 (each citing JA951)) This defied the principle that courts should decline to "impose a formalistic obligation on government witnesses to recite magic words." *United States v. Jimenez*, 593 F.2d 391, 401 (5th Cir. 2010). This also ignores that Ms. Ridgely herself is an Officer and her testimony plainly reflected her intention. It also ignored her intimate knowledge of the other Directors and Officers who are her family members.

Indeed, when he considered whether any person other than the existing Directors and Officers would serve if their predecessors were facing multiple lawsuits, Judge Kenney acknowledged that they likely would not, stating:

> In fairness, it is possible that the Debtor might have difficulty attracting new officers and directors if its current officers and directors face substantial liabilities arising out of their employment with the company.

(RO p.19, JA1559)

Here there was no reason to assume the Directors and Officers would not make a similarly rational choice to resign.[15]  *See Beanstalk Group v. AM Gen. Corp.*, 283 F.3d 856, 859-860 (7th Cir. 2002) (parties are "presumed to be rational persons pursuing rational ends").  First, if NHF faced failure, Directors and Officers' personal assets would be at direct risk.  Even if they ultimately prevailed, defense costs could jeopardize their own financial security.

Both Courts below assumed that since any liability was for past conduct, it would not impact the Officers' and Directors' willingness to serve, yet one who remains at a failed company is a more salient target than one who has left.

The District Court also found that the fact that the Plan has a severability provision somehow made it more likely the Directors and Officers would serve, (Op. 11 & n.8, 14, JA1828-31), but this reasoning is flawed.  Nothing in the Plan obligates the Directors and Officers to serve if the Releases are severed.  Indeed, as this Court noted in *NHF I*, severability just means the Plan is legally enforceable even if a particular term is severed.  (JA1536)  This does not address the economic realities of whether a reorganization is successful – realities which Section

---

[15] The District Court also was skeptical that the Directors and Officers have other options outside of NHF.  Yet, each Director and Officer had skills, experience and education that made him or her highly mobile.  (JA930-34)

1129(a)(11) and *Bank of America* emphasize.  Certainly many reorganized debtors fail even though their plans of reorganization contained a boilerplate severability clause.

### 4.    The Impacted Classes Overwhelmingly Voted In Favor Of The Plan.

Because only classes of creditors that were impaired – Classes III(A) (the Mancillas Family) and III(B) (Annuitants) – voted overwhelmingly to accept the Plan, factor four of the *Dow Corning* test was satisfied, but the Courts below erroneously found otherwise.

The remaining class of claims – Class III(C) – was unimpaired and therefore deemed to have accepted the Plan as a matter of law.  11 U.S.C. §1126(f) ("…a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan …").  Thus, NHF received 100% acceptance from all such classes of claims, undisputedly "overwhelming" acceptance for this *Dow Corning* factor.

Both Courts below erroneously found that donors whose claims against NHF were barred were an impacted "class" who did not vote for the Plan.  *Dow Corning* refers to classes *of creditors.*  280 F.3d at 658.  The cases relied on by Judge Kenney do likewise.  (*See* RO p.20-21, JA1560-61 (quoting *In re Tribune Co.*, 464 B.R. 126, 186 (Bankr. D. Del. 2011) (noting agreement by a "substantial majority of creditors"); *In re Lower Bucks Hosp.*, No. 10-10239-ELF, 2012 WL 165596 at

*29 (Bankr. E.D.Pa. May 10, 2012) (referring to "adversely affected class of creditors"). The concern of the Courts below with disallowed claims, or more importantly, unfiled alleged donor "claims" of those that chose not to participate in the Bankruptcy case, is unprecedented in bankruptcy law jurisprudence and inconsistent with what the Bankruptcy Code's requirements. It is axiomatic that donors who failed to establish "claims" against NHF as part of the bankruptcy process – of which they all had notice and an opportunity to participate – are simply not creditors of NHF. *See, e.g.*, 11 U.S.C. §101(5) (claim means a "right to payment"), §101(10) (creditor is one who has a claim). As Anderson illustrates, a donor may not have a claim because she sat on her rights or failed to properly file. Or, as the Behrmanns show, a donor may not have a claim because they voluntarily compromised such claim. Or, as Judge Mitchell recognized could be true, donors may not have a claim because the law makes their donation a gift over which they have no future rights. (JA1085) In any case, they have no further rights as a "claimant" or "creditor" and should not be considered in evaluating creditor support for the Plan. They had the opportunity to participate fully in the bankruptcy process, and both the Behrmanns and Anderson did just that. They also had the opportunity to establish a "claim" against NHF and have that "claim" paid in full plus interest. If that did not happen, it is only as result of their actions or inactions, and they should not now be given second and third bites at the apple.

Both Courts below noted that *A.H. Robins* provided an opportunity for recovery to those with late claims.  (RO p.21, JA1561; Op. 18, JA1835)  The drafters of the plan in *A.H. Robins* may have decided in that particular case that this made strategic sense, but nothing in that decision or any other case makes this a requirement for a release.  Rather, in *NHF I* this Court stressed that circumstances need not be a precise "fit" with those presented in *A.H. Robins* in order to justify releases and injunctions.  (JA1534)  Indeed, Anderson – who filed a late claim, appealed the denial of her claim to this Court and lost – exemplifies why an opportunity to recover on late claims makes no sense here.  Letting Anderson sue would effectively nullify this Court's decision in her prior appeal.

### 5.    The Plan Made Provision To Pay All Classes Affected By The Releases.

The Courts below acknowledged that each donor had notice of the bankruptcy case and the opportunity to file and prosecute a claim that – if allowed over the Debtor's objection – the Plan provided would be paid in full with interest.  (RO p.22-23, JA1562-63; Op. 18, JA1835)  Every donor had notice and an opportunity to litigate NHF's claim objection and, if they prevailed, to be paid in full plus 4% interest.  This process unquestionably worked – NHF indisputably settled all remaining claims of claimants who litigated against NHF.  This shows that this *Dow Corning* factor was satisfied.  As with factor four, the Court below erred in concluding that this mechanism had to protect those who sat on their

rights, had claims disallowed or never filed a claim in the first place.  Again, no law requires this.

### 6.    The Plan Provided An Opportunity For Claimants Who Chose Not To Settle To Recover In Full.

Finally, based on the same flawed assumption – that a Plan had to provide for those with late or invalid claims for the Releases to be viable – the Courts below erroneously found that there was no opportunity for those who did not settle to recover in full. (RO p.23, JA1563; Op. 19-20, JA1836-37)  Again, this factor was satisfied because those donors who wanted to could have filed and attempted to litigate to obtain an allowed claim, which, if successful, would have been paid in full.

## VIII.  CONCLUSION

For the foregoing reasons, this Court should reverse the Order of the District Court, which in turn affirmed the Remand Order, and instead declare that the record sufficiently demonstrates that the Releases are justified.

## REQUEST FOR ORAL ARGUMENT

Appellant National Heritage Foundation, Inc., respectfully requests that this Court conduct oral argument.

Date:  July 17, 2013                    Respectfully submitted,

                                        /s/ David B. Goroff
                                        Erika Morabito
                                        Rory E. Adams
                                        FOLEY & LARDNER LLP

3000 K Street N.W., Suite 600
Washington, DC 20007-5109
Telephone:  202-672-5300
emorabito@foley.com
radams@foley.com

David B. Goroff
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL  60654
Telephone:  312-832-4500
dgoroff@foley.com

***Counsel for Appellant***
***National Heritage Foundation, Inc***
.

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No.** _____    **Caption:** _____

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the   type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ ]    this brief contains _____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ]    this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ ]    this brief has been prepared in a proportionally spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*]; **or**

[ ]    this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s)_____

Attorney for_____

Dated:_____

04/13/2012
SCC

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2013, I electronically filed the foregoing **BRIEF OF APPELLANT NATIONAL HERITAGE FOUNDATION, INC.** on behalf of National Heritage Foundation, Inc. with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following counsel of record.  I further certify that I served a copy of the foregoing by Federal Express, next day delivery on the following:

*Counsel for Appellees*

Gregory M. Wade, Esq.
Wade, Friedman, Sutter & Dupray, P.C.
616 N. Washington St.
Alexandria, VA  22314
wade@oldtownlawyers.com

Glenn W. Merrick, Esq.
G.W. Merrick & Associates, LLC
6300 South Syracuse Way, Suite 220
Centennial, CO 80111
gwm@gwmerrick.com


/s/ David B. Goroff
Erika Morabito
Rory E. Adams
FOLEY & LARDNER LLP
3000 K Street N.W., Suite 600
Washington, DC 20007-5109
Telephone:  202-672-5300
emorabito@foley.com
radams@foley.com

David B. Goroff
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL  60654
Telephone:  312-832-4500
dgoroff@foley.com

**Counsel for Appellant
National Heritage Foundation, Inc.**

4826-6201-1924